ORIGINAL

KENJI M. PRICE #10523
United States Attorney
District of Hawaii

JUDY PHILIPS
First Assistant U.S. Attorney

MICHAEL NAMMAR
MICAH SMITH
MARK A. INCIONG
Assistant U.S. Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii   96850
Telephone:   (808) 541-2850
Facsimile:   (808) 541-2958
Email:   Michael.Nammar@usdoj.gov
         Micah.Smith@usdoj.gov
         Mark.Inciong@usdoj.gov

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 0 6 2020

at __/__ o'clock and _a0_ min. _/_ M _ey_
MICHELLE RYNNE, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR. NO. 20-00086-DKW |
| | ) |
| Plaintiff, | ) MEMORANDUM OF PLEA |
| | ) AGREEMENT |
| vs. | ) |
| | ) DATE:  November 6, 2020 |
| JACOB L. SMITH, | ) TIME:  11:00 a.m. |
| | ) JUDGE: Hon. Derrick K. Watson |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM OF PLEA AGREEMENT**

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the

UNITED STATES OF AMERICA, by its attorney, the United States Attorney for

the District of Hawaii, and the defendant, JACOB L. SMITH, and his attorney,

Mark S. Kawata, Esq., have agreed upon the following:

## THE CHARGES

1.     The defendant acknowledges that he has been charged in an

Information with violating Title 18, United States Code, Section 1962(d) (Count 1)

and Title 21, United States Code, Sections 846 and 841(b)(1)(A) (Count 2).

2.     The defendant has read the charges against him contained in the

Information, and those charges have been fully explained to him by his attorney.

3.     The defendant fully understands the nature and elements of the crimes

with which he has been charged.

## THE AGREEMENT

4.     The defendant agrees to waive indictment and enter a voluntary plea

of guilty to the Information, which charges him with conspiring to violate the

racketeering laws of the United States, namely, Title 18, United States Code,

Section 1962(c) (Count 1), and conspiring to distribute and possess with intent to

distribute methamphetamine, in violation of Title 21, United States Code, Sections

846 and 841(b)(1)(A) (Count 2).   The defendant is aware that he has the right to

have these felonies asserted against him by way of grand jury indictment.   The

defendant hereby waives this right and consents that these offenses may be charged

against him by way of the Information.   In return, the government agrees to move

to dismiss Count 1 of the Criminal Complaint in Mag. No. 18-00884-KSC as to the

defendant after sentencing and the government agrees not to file additional charges

against the defendant based on (a) the conduct described in Count 1 of the

Criminal Complaint in Mag. No. 18-00884-KSC; (b) the defendant's participation,

beginning in or about 2015 and up to in or about August 2018, in the racketeering

enterprise described in Count 1 of the Information, including his participation in

each of the racketeering acts charged in Count 1 of the Information, to the extent

now known to the government; and (c) his participation, beginning in or about

2015 and up to in or about August 2018, in a conspiracy to distribute and possess

with intent to distribute methamphetamine, as charged in Count 2 of the

Information.

   5.    The defendant agrees that this Memorandum of Plea Agreement shall

be filed and become part of the record in this case.

   6.    The defendant enters this plea because he is in fact guilty of

conspiring to violate the racketeering laws of the United States, namely, Title 18,

United States Code, Section 1962(c) (Count 1) and of conspiring to distribute and

possess with intent to distribute methamphetamine, in violation of Title 18, United States Code, Sections 846 and 841(b)(1)(A) (Count 2) as charged in the Information, and he agrees that this plea is voluntary and not the result of force or threats.

## PENALTIES

7.     The defendant understands that the penalties for the offense to which he is pleading guilty include:

a.     For Count 1, a term of imprisonment of up to 20 years and a fine of up to $250,000, plus a term of supervised release of up to 3 years.

b.     For Count 2, a term of imprisonment of not less than 10 years and not more than life and a fine of up to $10,000,000, plus a term of supervised release of not less than 5 years and up to life.

c.     In addition, the Court must impose a $100 special assessment as to each count to which the defendant is pleading guilty.   The defendant agrees to pay $100 for each count to which he is pleading guilty to the District Court's Clerk's Office, to be credited to said special assessment, before the commencement of any portion of sentencing.   The defendant acknowledges that failure to make such full advance payment in a form and manner acceptable to the prosecution will

allow, though not require, the prosecution to withdraw from this Agreement at its option.

      d.   **Forfeiture.**  Title 18, United States Code, Section 1963 authorizes forfeiture of any interest the defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962; of any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant established, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and any property constituting, or derived from, any proceeds obtained directly or indirectly from racketeering activity in violation of Title 18, United States Code, Section 1962.   Title 21, United States Code, Section 853, authorizes forfeiture of any (1) property constituting, or derived from, proceeds the defendant obtained, directly or indirectly, as a result of the violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A), and (2) property used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, such violation.

      e.   **Loss of Federal Benefits.**  At the discretion of the Court, the defendant may also be denied any or all federal benefits, as that term is defined in Title 21, United States Code, Section 862, (1) for up to five years if this is the

defendant's first conviction of a federal or state offense amounting to the distribution of controlled substances, or (2) for up to ten years if this is the defendant's second conviction of a federal or state offense consisting of the distribution of controlled substances.   If this is the defendant's third or more conviction of a federal or state offense amounting to the distribution of controlled substances, the defendant is permanently ineligible for all federal benefits, as that term is defined in Title 21, United States Code, Section 862(d).

      f.    **Restitution.**   The Court must also award restitution pursuant to Title 18, United States Code, Section 3663A, to the persons and entities victimized by the defendant's commission of the offense charged in Count 1 of the Information.   The defendant understands that the Court will determine the amounts of restitution to be ordered, as well as the persons and entities entitled to such restitution, with the assistance of the United States Probation Office.   The defendant agrees to pay restitution for all losses caused by the defendant's conduct, regardless of whether the counts of the Information associated with such losses will be dismissed as part of this Agreement.

## **FACTUAL STIPULATIONS**

8.     The defendant admits the following facts and agrees that they are not

a detailed recitation, but merely an outline of what happened in relation to the

charge to which the defendant is pleading guilty:

a.     From a precise date unknown, but by at least in or about 2015,

and continuing to at least in or about August 2018, JACOB L. SMITH, the

defendant, and others known and unknown, were members and associates of the

"Miske Enterprise."   Members and associates of the Miske Enterprise operated

principally under the direction and protection of Michael J. Miske, Jr., who used

his power over members and associates of the Miske Enterprise, his reputation for

violence in the community, and the various corporate entities under his control to

enrich the members and associates of the Miske Enterprise and to protect their

criminal activities.

b.     The Miske Enterprise, including its leadership, membership,

and associates, constituted an "enterprise" as that term is defined in Title 18,

United States Code, Section 1961(4), that is, a group of individuals and entities

associated in fact.   The Miske Enterprise was engaged in, and its activities

affected, interstate and foreign commerce.   The Miske Enterprise operated within

the District of Hawaii and elsewhere and constituted an ongoing organization

7

whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Miske Enterprise.

c.    Beginning at least in or about 2015, SMITH and others known and unknown, being persons employed by and associated with the Miske Enterprise, willfully and knowingly combined, conspired, confederated, and agreed to together and with each other to violate the racketeering laws of the United States, namely, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Miske Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

d.    The racketeering activity to which SMITH and others agreed included:   (a) acts involving murder (as described in paragraphs 8.e.i through 8.e.iv, below); (b) acts involving arson; (c) acts involving extortion; (d) acts relating to chemical weapons; (e) acts involving robbery and acts relating to interference with commerce, robbery, or extortion; and (f) offenses involving the felonious trafficking of controlled substances, as alleged in Count 1 of the Information.   The offenses involving the felonious trafficking of controlled substances included a conspiracy to distribute and possess with intent to distribute methamphetamine, as separately charged in Count 2 of the Information.   In

8

addition, SMITH assisted with numerous assaults on behalf of Miske and the Miske Enterprise.

      e.   **Acts Involving Murder.**   SMITH assisted Miske with murder-for-hire conspiracies and an attempted murder, though no one died as a consequence of SMITH's efforts.

      i.   In or about 2016, SMITH assisted with a murder-for-hire conspiracy in which Victim-1 was the intended victim. Miske put the murder contract on Victim-1, and asked to meet with SMITH and Lance L. Bermudez at the Kamehameha Shopping Center in the Kalihi area of Oahu. By this time, Miske had heard from both John B. Stancil and from SMITH that Bermudez was a "shooter"—that is, that Bermudez was willing to commit acts of violence using a firearm. Miske asked SMITH to introduce Miske to Bermudez. SMITH arranged a meeting with Miske, SMITH, and Bermudez at the shopping center. Miske expressed his interest in having Victim-1 killed. After the meeting, Stancil spoke again with SMITH and Bermudez and explained that Miske would pay Bermudez $250,000 to kill Victim-1. SMITH and Bermudez discussed the contract, and SMITH indicated that he would not participate, but he understood that Bermudez was interested in taking on the job. Miske thereafter periodically followed up with SMITH to ask whether Bermudez was making progress. At one

point, Bermudez and Dae Han Moon told SMITH that they had gone together to wait outside of the home of Victim-1, armed with various firearms, prepared to shoot and kill Victim-1 once he came outside, but Victim-1 never came outside while Bermudez and Moon were there.

    ii.  Beginning in or about 2017, SMITH agreed to assist Miske with a murder contract Miske had placed on Victim-2.   Miske asked SMITH and Stancil to find him a hitman to kill Victim-2, and Miske provided them with a vehicle to use and with intelligence that Victim-2 could be targeted at a bar he frequented.   Miske also told SMITH that he was contemplating offering the murder contract to an associate of Miske ("CC-3"), but that Miske had concerns about whether he could trust CC-3 if CC-3 were caught.

    iii.  On or about May 23, 2017, Miske recruited SMITH, Harry K. Kauhi, and Stancil to travel by vehicle with him to Kualoa Ranch, where Victim-2 worked.   Before arriving at Kualoa Ranch, Miske checked that Stancil and SMITH were armed with firearms, and instructed them not to let Victim-2 get close to him.   Both Stancil and SMITH did have loaded firearms, and Stancil had a mask.   When Miske, Stancil, and SMITH arrived at Kualoa Ranch, Miske began to approach Victim-2, and when Victim-2 got sufficiently close, Stancil and SMITH both pulled out their firearms.   SMITH fired a gunshot in Victim-2's

general direction, but purposely missed.   Stancil pointed his firearm at Victim-2,

though SMITH could not determine whether Stancil had also fired a gunshot.

After the shooting incident, SMITH and Kauhi gave the firearms to another

individual in order to get rid of them.

              iv.       Later, between December 2017 and August 2018, Miske

and SMITH exchanged numerous messages in which they continued to discuss

wanting to harm Victim-2.   In one message, SMITH wrote that they needed to

"get this bitch ass for meet up", and that "Guarantee break jaw legs arms

everything".   Miske responded, "I trying".   In another series of messages, SMITH

wrote, "Fuck this fagget I promise over everything I see him I going turn his fuckn

jaw", to which Miske responded, "and not stop".   SMITH then wrote, "Yup I

going fuckn knock teeth out his mouth", to which Miske responded, "Not enuf".

         f.     **Acts Involving Arson.**   In or about 2016 or 2017, Miske

offered SMITH a couple thousand dollars to burn down the home of an individual

whose cousin had an ongoing civil case against Miske based on that cousin having

been assaulted at Miske's nightclub in December 2012.   Stancil showed SMITH

where the individual's house was when SMITH and Stancil were in the area, but

the two and Bermudez ultimately decided not to carry out the arson.

11

g.     **Acts Involving Extortion.**   SMITH assisted Miske with

efforts to extort individuals and businesses.

i.      In or about March 2017, Miske arranged to meet with an

individual who co-owned a nightclub in Honolulu at the offices of Kamaaina

Termite and Pest Control ("KTPC") on Queen Street in Honolulu.   An associate of

Miske ("CC-4") allowed SMITH into KTPC's offices, at which point SMITH met

Miske, who told him that when Miske scratched his head, SMITH should begin to

beat up the person in Miske's office.   MISKE and that individual were seated

facing each other.   While they spoke, SMITH came up behind the individual, and

when MISKE scratched his head, SMITH began to beat the individual with his

fists.   While SMITH was beating the individual, Miske berated the individual

about "[CC-4's] Rolex."   Miske later paid SMITH approximately $1,000.

ii.      On or about March 4, 2017, Miske recruited SMITH to

assist him with an extortion of a Honolulu karaoke bar.   Miske explained to

SMITH that the bar was not giving one of Miske's girlfriends a private lounge.

Miske asked SMITH to go to the bar with him and handed SMITH a baton.   When

they entered, SMITH brandished the baton while Miske demanded that the bar give

the girlfriend a private lounge.   In light of the threat of violence, the bar relented,

and SMITH left without having to engage in any violence.   (SMITH then

proceeded, that same evening, to participate in the second of two chemical weapon attacks on nightclubs in Honolulu, as described below.)

      h.   **Acts Relating to Chemical Weapons.**  On consecutive nights in March 2017, SMITH and other members and associates of the Enterprise participated in chemical weapon attacks on two nightclubs located in Honolulu. Both of these attacks were carried out on Miske's orders.  For each attack, SMITH served as the driver.  In advance of each attack, SMITH drove to the house of Stancil, who provided a chemical called chloropicrin to SMITH for his use in carrying out the attacks and also gave SMITH advice on how best to release the chloropicrin in the nightclubs.  During the first attack, on March 3, 2017, SMITH drove Kaulana Freitas to Stancil's home to pick up the chloropicrin, and then drove Freitas to the nightclub, after which Freitas entered the nightclub and released the chloropicrin.  During the second attack, on March 4, 2017, SMITH drove another individual ("CC-5") to Stancil's home to pick up the chloropicrin, and then drove CC-5 to the nightclub, after which CC-5 entered the nightclub and released the chloropicrin.  On each occasion, the release of the chloropicrin resulted in patrons of the nightclubs scrambling for the exits as they experienced burning in their eyes and difficulty breathing.

13

i.    **Acts Involving Robbery and Relating to Interference with**

**Commerce, Robbery, or Extortion**.    At various times between in or around 2016

and in or about 2018, SMITH and other members of the Miske Enterprise engaged

in robberies.    Often the target of the robberies were drug dealers.

      i.    In around 2015, Stancil recruited SMITH to commit

robberies of drug dealers with other members and associates of the Miske

Enterprise.    In late 2015, SMITH, Bermudez, and another individual ("CC-6"),

attempted to rob a drug dealer, Victim-6, on University Avenue in Honolulu.

SMITH and the others were armed with firearms, but did not find any drugs.

SMITH returned a second time in the spring of 2016 with Jarrin K. Young and

another person; on that occasion, SMITH and the others were not armed, but had

more success, securing a pound of methamphetamine from the home.

      ii.    After the attempted robbery of Victim-6, SMITH

continued to commit robberies of suspected drug dealers with Stancil and other

members and associates of the Enterprise.    In around 2016, SMITH, Stancil,

Bermudez, Kauhi, Norman L. Akau III, and CC-5, and another person committed a

robbery of a drug dealer, Victim-5.    During the robbery, SMITH, Stancil,

Bermudez, and Kauhi were masked, and everyone except for CC-5 was armed with

a firearm.    They obtained approximately five pounds of methamphetamine from

Victim-5.   (Victim-5 subsequently became one of SMITH's principal suppliers of methamphetamine, but he was not playing that role at the time he was targeted for this robbery.)

        iii.     In around 2016, SMITH, Bermudez, CC-5, and another person committed a robbery of a drug dealer, Victim-7.   SMITH and the others targeted Victim-7 because he was believed to have methamphetamine on him. SMITH and the others robbed two pounds of methamphetamine from Victim-7 and divided the drugs among themselves.   SMITH gave his share to Timothy G. Taboada to sell.

        iv.     In around 2018, Miske and SMITH made plans to rob a drug dealer, Victim-8, who lived in the Hawaii Kai area of Oahu.   Although the robbery never took place, Miske and SMITH had discussions about how to carry out the robbery.

        v.     SMITH also participated in a robbery and an attempted robbery of illegal game rooms.   The robbery occurred in 2016 in the Mapunapuna area of Oahu.   During this robbery, Taboada held a door open while SMITH and Bermudez entered with firearms.   Bermudez put a gun in the throat of a member of the game room's security staff while SMITH took a cashier into the back and took approximately $5,000 in cash.   The attempted robbery occurred on or about

15

October 15, 2017.   A friend of SMITH owed him a substantial amount of money for methamphetamine that SMITH had fronted to him.   SMITH began to pressure the friend to find a way to pay him back and threatened physical harm if he did not do so.   In response, SMITH's friend proposed to rob an illegal game room near the Don Quijote supermarket in Honolulu.   SMITH supplied his friend with a firearm, and then his friend and another person entered the illegal game room while SMITH and CC-6 watched from across the street.   SMITH's friend was not successful in carrying out the robbery—a security staff member ended up beating up SMITH's friend, who was then arrested and spent a few days in jail.

      vi.     At some point between 2016 and 2018, SMITH participated in a robbery of Victim-9.   SMITH directed that this robbery occur because he felt that Victim-9 had been disrespectful toward him.   SMITH, CC-6, and a friend of CC-6 conducted surveillance, and ultimately robbed Victim-9 with masks and guns.   The group obtained a gold chain from Victim-9, which they first offered to CC-3.   When CC-3 did not claim the chain quickly enough, they turned to a pawn shop and sold it for $6,000.

      vii.     A rapper and entertainer, Victim-10, traveled to Honolulu to perform at a music venue on May 8, 2018.   Victim-10 was known to adorn himself in expensive jewelry, including a gold chain and medallion purportedly

16

worth several hundred thousand dollars.   Between May 7 and 8, 2018, SMITH,

Victim-5, Jarrin K. Young, and another person conspired to rob Victim-10 of his

valuables, including his gold chain and medallion, during his visit to Hawaii.

Among other things, SMITH and the others discussed obtaining vehicles and about

the timing of the robbery.   Ultimately, the men called off the robbery.

   j. **Offenses Involving the Felonious Trafficking of Controlled**

**Substances.**   Between in or around 2015 and in or around 2018, SMITH

conspired with others to distribute controlled substances, including

methamphetamine, a Schedule II controlled substance.   Over the course of the

conspiracy, SMITH was involved in the distribution or more than 50 grams of

methamphetamine.   Among the individuals with whom SMITH worked to

distribute methamphetamine were Taboada, Victim-5, Young, Kauhi, Freitas,

Hunter J. Wilson, Bermudez, and Moon, among others.   Although Miske was not

directly involved in SMITH's drug trafficking activity, SMITH benefitted from the

protection he derived from being associated with Miske and the Miske Enterprise.

   k. **Assaults.**   Up until in or about 2018, SMITH—who is a skilled

martial artist—was "on call" for Miske, available to commit non-fatal acts of

violence whenever Miske called upon him to do so.   This arrangement began in

around 2015, when Stancil informed SMITH that Miske was "the man" and that

17

SMITH should want to get "in" with Miske.   Stancil explained to SMITH that he could make substantial amounts of money if he were willing to commit acts of violence on Miske's behalf.   SMITH agreed to do so, and began committing assaults of individuals Miske selected.   On some occasions, Miske himself was present while SMITH committed the assault, and Miske would direct SMITH when to stop.   Miske would pay SMITH in cash after each job, typically in amounts ranging from $1,500 to $2,000 per job.

1.   On or about June 4, 2019, when SMITH was in federal custody, SMITH heard that another inmate, Victim-11, had been telling other inmates that SMITH was cooperating with law enforcement.   When SMITH and Victim-11 were in the same area of the federal facility, SMITH assaulted Victim-11 by kicking him in the face.

9.   Pursuant to CrimLR 32.1(a) of the Local Rules of the United States District Court for the District of Hawaii, the parties agree that the charges to which the defendant is pleading guilty adequately reflect the seriousness of the actual offense behavior and that accepting this Agreement will not undermine the statutory purposes of sentencing.

## SENTENCING STIPULATIONS

10.     Pursuant to CrimLR 32.1(b) of the Local Rules of the United States District Court for the District of Hawaii and Section 6B1.4 of the Sentencing Guidelines, the parties stipulate to the following for the purpose of the sentencing of the defendant in connection with this matter:

a.     As of the date of this agreement, it is expected that the defendant will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offense and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility.  If all of these events occur, and the defendant's acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate.  *See* U.S.S.G. § 3E1.1(a) and Application Note 3.

b.     The United States Attorney agrees that the defendant's agreement herein to enter into a guilty plea constitutes notice of intent to plead guilty in a timely manner, so as to permit the government to avoid preparing for trial as to the defendant.  Accordingly, the United States Attorney anticipates moving in the Government's Sentencing Statement for a one-level reduction in sentencing offense level pursuant to Guideline § 3E1.1(b)(2), if the defendant is

19

otherwise eligible.   The defendant understands that notwithstanding its present intentions, and still within the Agreement, the prosecution reserves the rights (1) to argue to the contrary in the event of receipt of new information relating to those issues, and (2) to call and examine witnesses on those issues in the event that either the United States Probation Office finds to the contrary of the prosecution's intentions or the Court requests that evidence be presented on those issues.

11.   The parties agree that notwithstanding the parties' Agreement herein, the Court is not bound by any stipulation entered into by the parties but may, with the aid of the presentence report, determine the facts relevant to sentencing.   The parties understand that the Court's rejection of any stipulation between the parties does not constitute a refusal to accept this Agreement since the Court is expressly not bound by stipulations between the parties.

12.   The parties represent that as of the date of this agreement there are no material facts in dispute.

## APPEAL/COLLATERAL REVIEW

13.   The defendant is aware that he has the right to appeal his convictions and the sentence imposed.   The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his convictions and any sentence within the Guidelines range as determined by the Court at the time of

sentencing, and any lawful restitution order imposed, or the manner in which the sentence or restitution order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement.   The defendant understands that this waiver includes the right to assert any and all legally waivable claims.

      a.     The defendant also waives the right to challenge his convictions or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may make such a challenge (1) as indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

      b.     If the Court imposes a sentence greater than specified in the guideline range determined by the Court to be applicable to the defendant, the defendant retains the right to appeal the portion of his sentence greater than specified in that guideline range and the manner in which that portion was determined and to challenge that portion of his sentence in a collateral attack.

      c.     The prosecution retains its right to appeal the sentence and the manner in which it was determined on any of the grounds stated in Title 18, United States Code, Section 3742(b).

## FINANCIAL DISCLOSURE

14.     In connection with the collection of restitution or other financial

obligations that may be imposed upon him, the defendant agrees as follows:

a.     The defendant agrees to fully disclose all assets in which he has

any interest or over which he exercises control, directly or indirectly, including any

assets held by a spouse, nominee, or third party.   The defendant understands that

the United States Probation Office (USPO) will conduct a presentence

investigation that will require the defendant to complete a comprehensive financial

statement.   To avoid the requirement of the defendant completing financial

statements for both the USPO and the government, the defendant agrees to

truthfully complete a financial statement provided to the defendant by the United

States Attorney's Office.   The defendant agrees to complete the disclosure

statement and provide it to the USPO within the time frame required by the United

States Probation officer assigned to the defendant's case.   The defendant

understands that the USPO will in turn provide a copy of the completed financial

statement to the United States Attorney's Office.   The defendant agrees to provide

written updates to both the USPO and the United States Attorney's Office

regarding any material changes in circumstances, which occur prior to sentencing,

within seven days of the event giving rise to the changed circumstances.   The

22

defendant's failure to timely and accurately complete and sign the financial statement, and any written update thereto, may, in addition to any other penalty or remedy, constitute the defendant's failure to accept responsibility under U.S.S.G § 3E1.1.

b.    The defendant expressly authorizes the United States Attorney's Office to obtain his credit report.   The defendant agrees to provide waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the financial information, such releases to be valid for a period extending 90 days after the date of sentencing.   The defendant also authorizes the United States Attorney's Office to inspect and copy all financial documents and information held by the USPO.

c.    Prior to sentencing, the defendant agrees to notify the Financial Litigation Unit of the U.S. Attorney's Office before making any transfer of an interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by the defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations.

**IMPOSITION OF SENTENCE**

15.    The defendant understands that the District Court in imposing sentence will consider the provisions of the Sentencing Guidelines.   The defendant

agrees that there is no promise or guarantee of the applicability or non-applicability of any Guideline or any portion thereof, notwithstanding any representations or predictions from any source.

16.     The defendant understands that this Agreement will not be accepted or rejected by the Court until there has been an opportunity by the Court to consider a presentence report, unless the Court decides that a presentence report is unnecessary.   The defendant understands that the Court will not accept an agreement unless the Court determines that the remaining charge adequately reflects the seriousness of the actual offense behavior and accepting the Agreement will not undermine the statutory purposes of sentencing.

## WAIVER OF TRIAL RIGHTS

17.     The defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, then he would have the right to a public and speedy trial.   The trial could be either a jury trial or a trial by a judge sitting without a jury.   The defendant has a right to a jury trial.   However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the prosecution, and the judge all must agree that the trial be conducted by the judge without a jury.

24

b.      If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random.   The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges.   The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.   The jury would be instructed that the defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt.

c.      If the trial is held by a judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not he or she was persuaded of the defendant's guilt beyond a reasonable doubt.

d.      At a trial, whether by a jury or a judge, the prosecution would be required to present its witnesses and other evidence against the defendant.   The defendant would be able to confront those prosecution witnesses and his attorney would be able to cross-examine them.   In turn, the defendant could present witnesses and other evidence on his own behalf.   If the witnesses for the defendant would not appear voluntarily, the defendant could require their attendance through the subpoena power of the Court.

e.      At a trial, the defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify.

18.      The defendant understands that by pleading guilty, he is waiving all of the rights set forth in the preceding paragraph.   The defendant's attorney has explained those rights to him, and the consequences of the waiver of those rights.

## USE OF PLEA STATEMENTS

19.      If, after signing this Agreement, the defendant decides not to plead guilty as provided herein, or if the defendant pleads guilty but subsequently makes a motion before the Court to withdraw his guilty plea and the Court grants that motion, the defendant agrees that any admission of guilt that he makes by signing this Agreement or that he makes while pleading guilty as set forth in this Agreement may be used against him in a subsequent trial if the defendant later proceeds to trial.   The defendant voluntarily, knowingly, and intelligently waives any protection afforded by Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence regarding the use of statements made in this Agreement or during the course of pleading guilty when the guilty plea is later withdrawn.   The *only* exception to this paragraph is where the defendant fully complies with this Agreement but the Court nonetheless rejects it.

26

Under those circumstances, the United States may not use those statements of the defendant for any purpose.

20. The defendant understands that the prosecution will apprise the Court and the United States Probation Office of the nature, scope and extent of the defendant's conduct regarding the charges against him, related matters, and any matters in aggravation or mitigation relevant to the issues involved in sentencing.

## COOPERATION

21. The defendant agrees that he will fully cooperate with the United States.

a. The defendant agrees to testify truthfully at any and all trials, hearings, or any other proceedings at which the prosecution requests him to testify, including, but not limited to, any grand jury proceedings, trial proceedings involving co-defendants and others charged later in the investigation, sentencing hearings, and related civil proceedings.

b. The defendant agrees to be available to speak with law enforcement officials and representatives of the United States Attorney's Office at any time and to give truthful and complete answers at such meetings, but he understands he may have his counsel present at those conversations, if he so desires.

27

c.    The defendant agrees he will not assert any privilege to refuse to testify at any grand jury, trial, or other proceeding, involving or related to the crimes charged in this Information or any subsequent charges related to this investigation, at which the prosecution requests him to testify.

d.    The defendant agrees that his sentencing date may be delayed based on the government's need for the defendant's continued cooperation, and agrees not to object to any continuances of the defendant's sentencing date sought by the United States.

e.    Pursuant to Section 1B1.8(a) of the Sentencing Guidelines, the prosecution agrees that self-incriminating information provided pursuant to this Agreement to cooperate will not be used in determining the applicable guideline range, except as may be provided in this Agreement and under Section 1B1.8(b) of the Sentencing Guidelines.

22.    In the event that the defendant does not breach any of the terms of this Agreement but the Court nonetheless refuses to accept the Agreement after the defendant has made statements to law enforcement authorities or representatives of the United States Attorney's Office pursuant to this Agreement, the prosecution agrees not to use said statements in its case-in-chief in the trial of the defendant in this matter.   The defendant understands that this does not bar the use of

information and evidence derived from said statements or prohibit the use of the statements by the prosecution in cross-examination or rebuttal.

23.     Pursuant to Guidelines § 5K1.1 and Rule 35(b) of the Federal Rules of Criminal Procedure, the prosecution may move the Court to depart from the Guidelines on the ground that the defendant has provided substantial assistance to authorities in the investigation or prosecution of another person who has committed an offense.   The defendant understands that:

a.     The decision as to whether to make such a request or motion is entirely up to the prosecution.

b.     This Agreement does not require the prosecution to make such a request or motion.

c.     This Agreement confers neither any right upon the defendant to have the prosecution make such a request or motion, nor any remedy to the defendant in the event the prosecution fails to make such a request or motion.

d.     Even in the event that the prosecution makes such a request or motion, the Court may refuse to depart from the Guidelines or to impose a sentence below the minimum level established by statute.

24.     The defendant and his attorney acknowledge that, apart from any written proffer agreements, if applicable, no threats, promises, agreements or

conditions have been entered into by the parties other than those set forth in this Agreement, to induce the defendant to plead guilty.   Apart from any written proffer agreements, if applicable, this Agreement supersedes all prior promises, agreements or conditions between the parties.

25.   To become effective, this Agreement must be signed by all signatories listed below.

26.   Should the Court refuse to accept this Agreement, it is null and void and neither party shall be bound thereto.

DATED:   Honolulu, Hawaii, _October 29, 2020_.

AGREED:

KENJI M. PRICE
United States Attorney
District of Hawaii


JUDY PHILIPS
First Assistant U.S. Attorney


MICHAEL D. NAMMAR
MICAH SMITH
MARK A. INCIONG
Assistant U.S. Attorneys


MARK S. KAWATA, Esq.
Attorney for Defendant


JACOB L. SMITH
Defendant